<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

—————————————————————
                                            :
**NISSAN WORLD, LLC, et al.,**              :
                                            :
    **Plaintiffs,**       :
                                            :        **Civ. No. 05-2839 (MAH)**
**v.**                                      :
                                            :
**MARKET SCAN INFORMATION**                 :
**SYSTEMS, INC. & WELLS FARGO**             :
**FINANCIAL LEASING, INC.,**                :        **OPINION**
                                            :
    **Defendants.**       :
—————————————————————:

### I.    INTRODUCTION

This matter is before the Court by way of three motions: (1) the motion of Plaintiffs
Nissan World, LLC, Denville Nissan, Inc., Parkway Ford, Inc., Stateline Ford, Inc. d/b/a Ford &
Hyundai World, Ford World, LCC d/b/a Condit Ford, Toyota World LLC d/b/a Condit Toyota,
and Lakewood Toyota, Inc. d/b/a Toyota World of Lakewood (collectively "Plaintiffs") for
summary judgment as to Count VII of Plaintiffs' Complaint against Defendant Wells Fargo
Financial Leasing, Inc. ("Wells Fargo"); (2) Wells Fargo's motion for summary judgment as to
its counterclaims against Plaintiffs and crossclaims against Defendant Market Scan Information
Systems, Inc. ("Market Scan"); and (3) Plaintiffs' motion to enforce the Court's April 19, 2013
Order.  These motions were decided without oral argument pursuant to Fed. R. Civ. 78 and L.
Civ. R. 78.1.  For the reasons set forth herein: (1) Plaintiffs' motion for summary judgment
against Wells Fargo is denied; (2) Wells Fargo's motion for summary judgment against Market
Scan is granted-in-part and denied-in-part; (3) Wells Fargo's motion for summary judgment

against Plaintiffs is denied; and (4) Plaintiffs' motion to enforce the Court's April 19, 2013 Order is denied.

## II.   BACKGROUND

As the Court must analyze the record in a different light as to each pending motion, the following factual summary is provided for context only.

### A.   Pre-Arbitration

Plaintiffs are automobile dealerships that share a common ownership and operate under the trade name "Auto World Group."  Compl., ECF No. 1 ¶ 8.  Market Scan supplied to Plaintiffs the Market Scan Trio II System ("Trio II System"), which consisted of computer equipment, software, and technical support.  Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 75-2 ¶ 5.

Plaintiffs allege that on January 10, 2002, Chris Preziosi, acting on Plaintiffs' behalf, executed a purchase order for each dealership to lease the Trio II System.  Id.  Plaintiffs claim Market Scan induced Plaintiffs to enter into these agreements by providing rebates and agreeing to "absorb a total of $249,410.58 in so-called balloon payments scheduled to become due at the end of the 39-month leasing period, provided that Plaintiffs entered into new leases of 'equal or greater value' when the original leases expired."  Compl., ECF No. 1 ¶ 15.[1]

Market Scan did not directly lease the Trio II System to each Plaintiff.  Instead, Wells Fargo purchased the equipment from Market Scan and leased the equipment to Plaintiffs.  Id. ¶ 16.  Plaintiffs assert that on January 18, 2002, Market Scan presented Plaintiffs with two contracts for each dealership: (1) a Wells Fargo Financial Lease Agreement between the Plaintiff

---

[1] These balloon payments, also identified as the End of Lease Loyalty Option Payment, shall be referred to herein as the "Balloon Payments."

2

dealership, as lessee, and Wells Fargo, as lessor (a "Lease Agreement"); and (2) a Loyalty

Option Program Agreement (an "Option Agreement") between that dealership and Market Scan.

Id. ¶¶ 17-18.

      Each Lease Agreement is between Wells Fargo Financial Leasing, Inc., as lessor, and one

of the Plaintiff dealerships, as lessee.  See Lease Agreements, attached as Ex. A to the Affidavit

of Thomas K. Meeks in Support of Motion for Summary Judgment on Behalf of Wells Fargo

Financial Leasing, Inc. ("Meeks Aff."), ECF No. 74-3.  The Lease Agreements are form

contracts with the same terms.  Each Lease Agreement provides:

> YOUR DUTY TO MAKE THE LEASE PAYMENTS IS UNCONDITIONAL DESPITE EQUIPMENT FAILURE, DAMAGE, LOSS OR ANY OTHER PROBLEM.  IF THE EQUIPMENT DOES NOT WORK AS REPRESENTED BY THE VENDOR, OR IF THE VENDOR OR ANY OTHER PERSON FAILS TO PROVIDE ANY SERVICE, OR IF THE EQUIPMENT IS UNSATISFACTORY FOR ANY OTHER REASON, YOU WILL MAKE ANY SUCH CLAIM SOLELY AGAINST THE VENDOR OR OTHER PERSON AND WILL HAVE NO CLAIM AGAINST US.
>
> NO WARRANTIES: We are leasing the Equipment to you "AS IS". WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IN CONNECTION WITH THIS AGREEMENT.  We transfer to you for the term of this Lease all warranties, if any, made by manufacturer or supplier to us. . . . You agree to continue making payments to us under this Lease regardless of any claims you may have against the supplier or manufacturer.  YOU WAIVE ANY RIGHTS WHICH WOULD ALLOW YOU TO: (a) cancel or repudiate the Lease; (b) reject or revoke acceptance of the Equipment; (c) grant a security interest in the Equipment; (d) accept partial delivery of the Equipment; (e) "cover" by making any purchase or lease of substitute Equipment; and (f) seek specific performance against us.
>
> YOU UNDERSTAND THAT WE ARE A SEPARATE AND INDEPENDENT COMPANY FROM ANY VENDOR OR MANUFACTURER AND THAT NEITHER THE VENDOR NOR ANY OTHER PERSON IS OUR AGENT.  YOU AGREE THAT

> NO REPRESENTATION, GUARANTEE, OR WARRANTY BY
> THE VENDOR OR OTHER PERSON IS BINDING ON US, AND
> NO BREACH BY THE VENDOR OR OTHER PERSON WILL
> EXCUSE YOUR OBLIGATION TO US.

Id. (capitalization in original).  Furthermore, the first page of each Lease Agreement contains the

following integration clause (the "Integration Clauses"):

> You agree to all the terms and conditions shown above and on the
> reverse side of the Lease, that those terms and conditions are a
> complete and exclusive statement of our agreement and that they
> may be modified only be [sic] written agreement between you and
> us.  Terms or oral promises which are not contained in this written
> Lease may not be legally enforced.

Id.  Each Lease Agreement's payment schedule is attached as an addendum to the contract.

While the payment schedules vary, each payment schedule contains relatively low monthly

payments and a single, large Balloon Payment for the final month of the Lease.  See id.  For

example, pursuant to Lease Number 93000728-001, Toyota World of Lakewood was required to

make four monthly payments of $316.51, 35 monthly payments of $2,007.21, and, lastly, a

single Balloon Payment of $24,756.30.  Id.

For each Lease Agreement, there is a corresponding Option Agreement signed by Adam

Kincaid, Market Scan's Director of Funding and Chris Preziosi.  See Option Agreements,

attached as Ex. B to Meeks Aff., ECF No. 74-4.  Each Option Agreement reads:

> [U]pon expiration of the 39-month Lease Agreements with Wells
> Financial as Lessor, for your new Market Scan Trio II System, you
> will have the following options:
>
> 1. Renew the Lease Agreement, at equal or greater value,
>    for an additional 39-month term, at which time new
>    hardware and software will be provided and Market
>    Scan Information Systems, Inc., will reimburse you for
>    the End of Lease Loyalty Option Payment [Balloon
>    Payment].
>
> or

4

> 2. Return the Market Scan Systems(s) and make the End of Lease Loyalty Option Payment to Wells Fargo Financial.

Id.

On January 22, 2002, Dennis J. Van Olst, a Senior Account Executive at Market Scan, sent a letter to Plaintiffs confirming Market Scan would pay the Balloon Payments detailed in the addendums to the Lease Agreements and referenced in the Option Agreements if Plaintiffs entered into future leases with Market Scan that were of an "equal or greater value" compared to the prior leases. See January 22, 2002 letter from Daniel J. Van Olst (the "Van Olst Letter"), attached as Ex. D to Meeks Aff., ECF No. 74-6. Plaintiffs claim that, contrary to Market Scan's promise, Market Scan improperly attempted to "roll" these Balloon Payments into the new equipment leases. Compl., ECF No. 1 ¶¶ 22-23.

In the Complaint, Plaintiffs also brought a declaratory judgment claim against Wells Fargo. Plaintiffs assert that Wells Fargo is improperly seeking to have Plaintiffs make the Balloon Payments even though Wells Fargo knows, or should know, that Market Scan is responsible for making those payments. Compl., ECF No. 1 ¶ 64. Plaintiffs allege Wells Fargo allowed Market Scan to negotiate the Lease Agreements, received copies of the Option Agreements, accepted assignment of both the Lease Agreements and Option Agreements from Market Scan, and, therefore, cannot recover payment of the Balloon Payments from Plaintiffs. Id. ¶¶ 63-69.

On August 12, 2005, Wells Fargo filed its Answer, Affirmative Defenses, Counterclaim and Crossclaims. See ECF No. 7. Through its counterclaim, Wells Fargo seeks recovery of the Balloon Payments from Plaintiffs. Id. Additionally, Wells Fargo raises crossclaims against

5

Market Scan based upon Market Scan's alleged breach of the General Dealer Agreement between Wells Fargo and Market Scan.  Id. at 25.

### B.  The AAA Arbitration

Based upon the arbitration provisions in Market Scan's agreements with Plaintiffs, Plaintiffs and Market Scan arbitrated their claims against each other before Deborah Rothman of the American Arbitration Association.  During the pendency of this arbitration, this litigation, including Wells Fargo's claims, was stayed.  See Order, ECF No. 27.

In her detailed Final Award, the Arbitrator concluded that the dispute between Plaintiffs and Market Scan essentially "boils down to [] whether Market Scan properly included in the renewal lease rate offered to [Plaintiffs], the value of the Balloon Payments it agreed to reimburse to [Plaintiffs] upon renewal at equal or greater value."  See Final Award, attached as Exhibit A to the Certification of Neoma M. Ayala, Esq. ("Ayala Cert."), ECF No. 73-3, at 4. Importantly, the Arbitrator concluded that the Option Agreements "unambiguously required Market Scan to reimburse [Plaintiffs] for the Balloon Payments, not pay them itself[.]"  Id. at 9. Therefore, the Final Award specifically stated: "Market Scan shall reimburse [Plaintiffs] for each Balloon Payment that Wells Fargo Financial Leasing Inc. recovers from any of them under the Leases which are the subject of the within proceeding, net of any interest, attorney's fees or other costs or fees imposed by Wells Fargo for late payment."  Id. at 11.  Additionally, the Arbitrator found that:

1. Plaintiffs are not entitled to prejudgment interest on the Balloon Payments or any other part of the award.

2. Within 10 days, Market Scan must pay Plaintiffs' attorneys' fees totaling $205,417.61 and costs totaling $6,000.99.

3. The portion of the arbitrator's fees and the AAA administrative fees paid by Plaintiffs shall be reimbursed by Market Scan.

    4.  The award is a full settlement of all claims and counterclaims
        submitted in the arbitration.

Id.

### C. Post-Arbitration Litigation Before the Court

On June 14, 2012, Plaintiffs moved to vacate the stay and confirm the Arbitrator's award.
See ECF No. 43.  Defendant Market Scan opposed this motion, asserting that this Court lacked
jurisdiction over the matter as award had to be confirmed in California.  See ECF No. 52.  On
April 19, 2013, the Hon. Faith S. Hochberg, U.S.D.J., entered an Order granting in part and
denying in part Plaintiffs' motion.  See ECF No. 56.  This Order is the subject of Plaintiffs'
pending motion to enforce.

After concluding that the District of New Jersey had jurisdiction to decide Plaintiffs'
motion, Judge Hochberg, in reviewing the Arbitrator's Final Award, concluded "there are no
grounds whatsoever for vacating, modifying, or correcting the award[.]"  Order, ECF No. 56 at
2.  Therefore, Judge Hochberg ordered "the arbitration award to be enforced **in its entirety** for
Plaintiffs and against Market Scan.  Market Scan is ordered to **indemnify** Plaintiffs against any
judgment of a Balloon Payment **obtained by Wells Fargo against Plaintiffs** in the next stage of
the litigation.  **Market Scan is ordered to obey the other provisions in the award[.]**"  Id.
(emphasis added).  Judge Hochberg, however, denied Plaintiffs' request that the Court certify the
judgment as final under Federal Rule of Civil Procedure 54 because "Wells Fargo has not yet
recovered any Balloon Payments from Plaintiffs, and Wells Fargo's cross-claim and
counterclaim have not yet been resolved[.]"  Id.  Furthermore, because the parties' agreements
provided that the cost of confirming the arbitration award must be borne by the losing party,

Judge Hochberg ordered that Market Scan reimburse Plaintiffs' legal fees incurred in moving to confirm the award.  Id. at 2-3.

On September 12, 2013, the parties consented to the Undersigned's jurisdiction.  See ECF No. 72.

**III.   THE SUMMARY JUDGMENT MOTIONS**

**A.  Standard of Review**

Pursuant to Rule 56(c), a motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it might affect the outcome of the case, and an issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007).  All facts and inferences must be construed "in the light most favorable to the nonmoving party."  Peters v. Del. River Port Auth. of Pa. & N.J., 16 F.3d 1346, 1349 (3d Cir. 1994).   Where the non-moving party bears the burden of proof on an issue, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

The party seeking summary judgment must initially provide the Court with the basis for its motion.  Celotex Corp., 477 U.S. at 323.  This showing requires the moving party either to establish that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or demonstrate that the non-moving party has not shown the requisite facts

relating to an essential element of an issue on which it bears the burden.  Id. at 322-23.  Once the party seeking summary judgment has carried this initial burden, the burden shifts to the non-moving party.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).

To avoid summary judgment, where the non-moving party will bear the burden of proof at trial on a dispositive issue, he or she must demonstrate "specific facts showing that there is a genuine issue for trial."  Celotex Corp., 477 U.S. at 324.  The opposing party must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Id. at 587 (internal quotations and citation omitted).  In addition, summary judgment may be granted if the nonmoving party's "evidence is merely colorable, or is not significantly probative."  Anderson, 477 U.S. at 249-50 (citations omitted).

### B.  Wells Fargo's Motion for Summary Judgment on its Crossclaims Against Market Scan

#### 1.  The Parties' Arguments

##### a.  Wells Fargo's Moving Brief

Wells Fargo asserts that it is entitled to summary judgment against Market Scan for breaching three provisions of General Dealer Agreement between Wells Fargo and Market Scan. See Wells Fargo Br., ECF No. 74-8, at 25.

First, Wells Fargo asserts that Market Scan violated Section 8(c) of the General Dealer Agreement, which provides: "With respect to Goods sold hereunder, [Market Scan] warrants that . . . there are no other agreements or warranties given to [Plaintiffs] relating to the Good or Lease written or verbal that are not included in the documents given to Wells Fargo."  See General

Dealer Agreement § 8(c), attached as Ex. C to Meeks Aff., ECF No. 74-5.  Therefore, Wells

Fargo asserts the Option Agreements and Van Olst Letter constitute an improper "side deal" in

violation of that provision.  See Wells Fargo Br., ECF No. 74-8, at 25.  Mr. Meeks, a loan

adjustment officer at Wells Fargo, asserts that Wells Fargo first became aware of the Option

Agreements in 2005.  Meeks Aff., ECF No, 74-2 ¶ 14.  He further claims that Wells Fargo "took

no part in [the Option Agreements'] presentation, preparation, or negotiation, nor was MARKET

SCAN authorized by WELLS FARGO to enter into such Loyalty Option Program Agreements

on behalf of WELLS FARGO" and the Option Agreements were not otherwise "approved" by

Wells Fargo.  Id. ¶¶ 16-17.  Mr. Meeks also affirms that the Van Olst Letter was not provided to

Wells Fargo at the same time it was provided to Plaintiffs and Wells Fargo did not approve the

letter's contents.  Id. ¶ 26.

Second, Wells Fargo asserts that Market Scan breached Section 6(b) of the General

Dealer Agreement, in which Market Scan "represents, warrants and agrees that . . . [Market

Scan] is duly qualified to do business in such states in the United States where qualification is

reasonably believed necessary for its business operations[.]"  See General Dealer Agreement §

6(b), attached as Ex. C to Meeks Aff., ECF No. 74-5.  Wells Fargo argues that Market Scan did

not register to do business in New Jersey by obtaining a certificate of authority pursuant to N.J.

Stat. Ann. § 14A:13-3.  See Wells Fargo Br., ECF No. 74-8, at 28.  Wells Fargo does not

explain, however, how this failure in any way impacted the substantive obligations contained in

the General Dealer Agreement or what damages resulted from this breach.

Third, Wells Fargo argues that Market Scan violated Section 8(d) of the General Dealer

Agreement, which provides:

> With respect to Goods sold hereunder, [Market Scan] warrants that
> . . . [Market Scan] has and will continue to perform all of its

> obligations under the warranties given by [Market Scan] relating to
> the Goods and any accompanying software[.]

See General Dealer Agreement § 8(d), attached as Ex. C to Meeks Aff., ECF No. 74-5.  Wells Fargo essentially argues that: (1) Market Scan's promise to pay the Balloon Payments in the Option Agreements between Market Scan and Plaintiffs is an "express warranty" made by Market Scan and (2) Market Scan's failure to make these Balloon Payments is a breach of an express warranty, which constitutes a breach of Market Scan's obligation under the General Dealer Agreement.  See Wells Fargo Br., ECF No. 74-8, at 30.

Wells Fargo asserts that, pursuant to Section 9 of the General Dealer Agreement, if Market Scan breaches "any representation or warranty" that "has a material adverse affect [sic] upon Wells Fargo's ability to collect," Market Scan must repurchase the "Lease and/or Goods from Wells Fargo on demand for the unpaid balance due thereon."  See General Dealer Agreement, attached as Ex. C to Meeks Aff., ECF No. 74-5.  Wells Fargo asserts that it has made such a demand and, therefore, Market Scan must pay the unpaid balance (i.e., the Balloon Payments).  See Defs. Opp'n Br., ECF No. 74-8, at 33.

### b. Market Scan's Opposition

Regarding Wells Fargo's argument that Market Scan violated Section 8(c) by entering into a secret "side deal," Market Scan responds by disputing many of Wells Fargo's factual allegations.  Most importantly, Market Scan's co-founder, Russell G. West, has submitted a declaration in which he asserts that Market Scan and Wells Fargo jointly developed Market Scan's Loyalty Option Program (of which the Option Agreements are an exemplar).  See Declaration of Russell G. "Rusty" West in Support of Defendant Market Scan Information Systems, Inc.'s Opposition to Motion of Wells Fargo Financial Leasing, Inc. for Summary Judgment ("West Dec."), ECF No. 78-2 ¶¶ 6, 7.  Mr. West also asserts that all Loyalty Option

11

Program Agreements were provided to Wells Fargo and each of the 157 transactions in which Wells Fargo purchased equipment from Market Scan to lease to third parties involved Loyalty Option Program Agreements.  Id. ¶¶ 8-10.

Market Scan offers four arguments as to why it did not breach the General Dealer Agreement by failing to obtain a certificate of authority pursuant to N.J. Stat. Ann. § 14A:13-3: (1) Wells Fargo has failed to demonstrate that Market Scan was obligated to obtain a certificate of authority; (2) failing to obtain such certificate is not a material breach of the contract; (3) N.J. Stat. Ann. § 14A:13-3, by its terms, does not "impair the validity of any contract[;]" and (4) Market Scan substantially performed its obligation to be qualified to transact business in New Jersey because Market Scan had filed New Jersey corporate tax returns in 2001 and 2002 and reasonably believed it was qualified to conduct business in this State.  Market Scan Opp'n Br., ECF No. 78, at 6-9.

As to Section 8(d), Market Scan argues that Wells Fargo cannot assert that Market Scan's breach of the Option Agreements is also a breach of the General Dealer Agreement because: (1) Wells Fargo cannot assert it was not aware of the Option Agreements but then rely upon them; and (2) Wells Fargo cannot base its claim on warranties contained in the Option Agreements as Wells Fargo was not a party to those agreements.  Id. at 10.

### c.  Wells Fargo's Reply

In response to Mr. West's assertion that Wells Fargo assisted in the Loyalty Option Program's development, Wells Fargo argues there is no evidence of this fact except for Mr. West's "self-serving statement."  See Wells Fargo Reply Br., ECF No. 82, at 19.  Additionally, Wells Fargo asserts that the General Dealer Agreement governs the parties' entire business relationship and Market Scan had no right to amend agreements between Wells Fargo and lessors

12

(*i.e.*, Plaintiffs).  See id. at 19-20.  Finally, Wells Fargo asserts that Market Scan's failure to offer appropriate renewal terms to Plaintiffs is both a breach of the Option Agreements and a separate breach of Section 8(d) of the General Dealer Agreement.  See id. at 20-21.

### 2.  Analysis

The General Dealer Agreement is governed by Iowa law.  See General Dealer Agreement, attached as Ex. C to Meeks Aff., ECF No. 74-5.  Under Iowa law:

> In a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

Molo Oil Co v. River City Ford Truck Sales, Inc., 578 N.W.2d 222, 224 (Iowa 1998) (citing Iowa-Illinois Gas & Elec. Co. v. Black & Veatch, 497 N.W.2d 821, 825 (Iowa 1993)).  The Court shall separately address each provision of the General Dealer Agreement that Wells Fargo alleges Market Scan breached.

### a.  Section 8(c) of the General Dealer Agreement

Section 8(c) of the General Dealer Agreement provides: "With respect to Goods sold hereunder, [Market Scan] warrants that . . . there are no other agreements or warranties given to [Plaintiffs] relating to the Good or Lease written or verbal that are not included in the documents given to Wells Fargo."  See General Dealer Agreement §8(c), attached as Ex. C to Meeks Aff., ECF No. 74-5.  This provision does not necessarily preclude agreements between Market Scan and a lessee, but requires only that these agreements be provided to Wells Fargo.  Therefore, under this provision, whether the Option Agreements were provided to Wells Fargo is dispositive as to Wells Fargo's claim that Market Scan violated Section 8(c).  Clearly, there are disputed issues of material fact relating to Wells Fargo's receipt of, and knowledge of, the Option

Agreements.[2]  Compare Market Scan Information Systems, Inc.'s Response to Wells Fargo
Financial Leasing Inc.'s Separate Statement of Facts and Market Scan Information Systems,
Inc.'s Statement of Material Facts in Opposition to Wells Fargo Financial Leasing, Inc.'s Motion
for Summary Judgment, Statement of Additional Material Facts and Supporting Evidence, ECF
No. 78-1 ¶¶ 1-3 with Reply on Behalf of Wells Fargo Financial Leasing, Inc. to Market Scan
Information Systems, Inc.'s Statement of Additional Facts, ECF No. 82-21 at ¶¶ 1-3.  For
example, Mr. West claims to have personal knowledge of a number of transactions (157)
involving Loyalty Option Program Agreements that constituted a large amount of business ($11
million) during a specific period of time (June 12, 2001 to September 22, 2004).  See West Dec.,
ECF No. 78-2 ¶ 9.  For each transaction, Market Scan claims: (1) it sent a copy of the agreement
to Wells Fargo; (2) Mr. West would have been notified if any mailing had been returned as
undeliverable; and (3) Mr. West never received any such notification.  Id. ¶ 10.  Furthermore,
Mr. West claims Wells Fargo and Market Scan jointly developed the Loyalty Option Program in
2000.  Id. ¶ 7.

    Even if Wells Fargo is correct that Mr. West's statements are "self-serving," the Court of
Appeals for the Third Circuit has held that "a single, non-conclusory affidavit or witness's
testimony, when based on personal knowledge and directed at a material issue, is sufficient to
defeat summary judgment or judgment as a matter of law."  Cappuccio v. Prime Capital Funding
LLC, 649 F.3d 180, 189-90 (3d Cir. 2011) (citing Kirleis v. Dickie, McCamey & Chilcote, P.C.,
560 F.3d 156, 161-63 (3d Cir. 2009)).  That is true even when that evidence is "self-serving."

---

    [2] As discussed infra, there is no evidence that Wells Fargo did not receive the Option
Agreements.  In fact, Wells Fargo produced the Option Agreements as part of its file.  See
Counterstatement of Material Facts of Wells Fargo Financial Leasing, Inc. in Opposition to
Motion for Summary Judgment of Plaintiffs, ECF No. 79-1 ¶¶ 25-26.

Id.[3]  If it is the case that Market Scan and Wells Fargo jointly developed the Loyalty Option

Program, engaged in 157 transactions involving such agreements, and Market Scan provided the

Option Agreements to Wells Fargo, Wells Fargo's claim these the Option Agreements were an

impermissible side deal in violation of Section 8(c) likely would fail.  Therefore, the Court will

deny summary judgment as to Wells Fargo's claim that Market Scan breached Section 8(c) of

the General Dealer Agreement.[4]

### b.  Section 6(b) of the General Dealer Agreement

Through Section 6(b), Market Scan warranted that it was "duly qualified to do business

in such states in the United States where qualification is reasonably believed necessary for its

business operations."  See General Dealer Agreement, attached as Ex. C to Meeks Aff., ECF No.

74-5.  N.J. Stat. Ann. 14A:13-3 provides:

> No foreign corporation shall have the right to transact business in
> this State until it shall have procured a certificate of authority so to
> do from the Secretary of State. A foreign corporation may be
> authorized to do in this State any business which may be done
> lawfully in this State by a domestic corporation, to the extent that it

---

[3] Of course, a conclusory affidavit would be insufficient to defeat a motion for summary judgment.  See Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002).  As Mr. West's declaration sets forth specific factual claims based upon Mr. West's personal knowledge of Market Scan and Wells Fargo's business relationship, the Court cannot conclude that the declaration is conclusory.

[4] Market Scan does not dispute that Wells Fargo was not copied on the Van Olst Letter. See Market Scan Information System's Response to Wells Fargo Financial Leasing Inc.'s Separate Statement of Facts and Market Scan Information System Inc.'s Statement of Material Facts in Opposition to Wells Fargo Financial Leasing, Inc.'s Motion for Summary Judgment, ECF No. 78-1 ¶ 7.  However, the Court cannot, based upon the record before it, conclude that this correspondence constituted a "side deal."  The correspondence did not alter Market Scan's obligations under the Option Agreement, but instead served as a confirmation of the parties' agreement as memorialized in the Option Agreements.  See Section IV.B, infra (recognizing the Arbitrator's conclusion that Market Scan did not assume an obligation to make payment directly to Wells Fargo, but agreed only to reimburse Plaintiffs for any Balloon Payments made by Plaintiffs).

is authorized to do such business in the jurisdiction of its incorporation, but no other business.

The Court also will deny summary judgment as to Market Scan's alleged violation of Section 6(b) for failing to obtain a certificate of authority.  There are several genuine issues of material fact that preclude summary judgment.

First, Market Scan disputes that it was not qualified to conduct business in New Jersey. Compare Wells Fargo's Statement of Material Facts Not in Dispute, ECF No. 74-1 ¶ 9 with Market Scan Information Systems, Inc.'s Response to Wells Fargo Financial Leasing Inc.'s Separate Statement of Facts and Market Scan Information Systems, Inc.'s Statement of Material Facts in Opposition to Wells Fargo Financial Leasing, Inc.'s Motion for Summary Judgment, ECF No. 78-1 ¶ 9.  Additionally, while Market Scan has provided evidence suggesting that Wells Fargo did not obtain a certificate of authority to do business in New Jersey, Market Scan has provided three New Jersey corporation business tax returns in which Market Scan represented it was authorized to do business in New Jersey as of December 20, 1994. Compare Ex. V to the Declaration of Michael Korik in Support of the Motion for Summary Judgment on Behalf of Wells Fargo Financial Leasing, Inc. ("Korik Dec."), ECF No. 74-31 with Ex. 2 to West Dec., ECF No. 78-2.  But, neither party provides any legal authority to support its position that its evidence proves Market Scan was or was not qualified to conduct business in this State during the relevant period.  For example, Wells Fargo does not cite to any authority for the proposition that a New Jersey Department of Treasury No Records Certificate constitutes sufficient proof for the Court to conclude that Market Scan was not qualified to transact business in New Jersey.  See Wells Fargo Br., ECF No. 74-8, at 28.  On the other hand, Market Scan, while offering three tax returns in support of its position that it was qualified to do business in New Jersey, neither offers any support for its position that these tax returns are proof that it was qualified to do business in

16

this State nor any argument as to why the No Records Certification is not evidence that it was not so qualified.  <u>See</u> Market Scan Opp'n Br., ECF No. 78, at 6; Tax Returns, attached as Ex. 2 to West Dec., ECF No. 78-2.  Finally, Wells Fargo's reply brief contains no argument on this issue. <u>See</u> Wells Fargo Reply Br., ECF No. 80-1.

Second, assuming that Market Scan was not qualified to conduct business in New Jersey, Section 6(b) required Market Scan only to become qualified to do business in New Jersey if Market Scan "reasonably believed" that such qualification was necessary.  <u>See</u> General Dealer Agreement § 6(b), attached as Ex. C to Meeks Aff., ECF No. 74-5.  Market Scan has raised a disputed issue of material fact as to whether it reasonably believed that it did not need to obtain qualifications to conduct business in New Jersey (<i>i.e.</i>, obtaining a certificate of authority).   <u>See</u> <u>Vails v. United Cmty. Health Ctr.</u>, No. 11-4048, 2012 WL 6045941, at *26 (N.D. Iowa Dec. 5, 2013) (quoting <u>Iowa–Illinois Gas & Elec. Co. v. Black & Veatch</u>, 497 N. W.2d 821, 825 (Iowa 1993)) ("Generally, questions of performance or breach are for the jury."); <u>see also</u> Market Scan Information Systems, Inc.'s Response to Wells Fargo Financial Leasing Inc.'s Separate Statement of Facts and Market Scan Information Systems, Inc.'s Statement of Material Facts in Opposition to Wells Fargo Financial Leasing, Inc.'s Motion for Summary Judgment, ECF No. 78-1 ¶ 9; West Dec., ECF No. 78-2 ¶ 11.

Finally, assuming that Market Scan breached Section 6(b), Wells Fargo has not advanced sufficient factual support for the Court to conclude that this breach is "material" such that Wells Fargo can invoke the remedy provided in Section 9 of the General Dealer Agreement.  Section 9, by its own terms, is limited to breaches that "[have] a material adverse affect upon Wells Fargo's ability to collect, or the collectability of, any Lease entered into Wells Fargo pursuant to this Agreement."  General Dealer Agreement § 9, attached as Ex. C to Meeks Aff., ECF No. 74-5.

17

Viewing the facts in the light most favorable to Market Scan as the non-movant, the Court cannot conclude that a breach of Section 6(b) had a material impact on Wells Fargo's ability to collect the Balloon Payments from Plaintiffs.  See Vails, 2012 WL 6045941, at *26 (quoting Iowa–Illinois Gas & Elec. Co., 497 N. W.2d at 825)).  In fact, as Market Scan correctly notes, Wells Fargo has provided no evidence of any damages resulting from Market Scan's failure to obtain a certificate of authority.

### c.   Section 8(d) of the General Dealer Agreement

Section 8(d) of the General Dealer Agreement provides in pertinent part:

> With respect to Goods sold hereunder, [Market Scan] warrants that . . . [Market Scan] has and will continue to perform all of its obligations under the warranties given by [Market Scan] relating to the Goods and any accompanying software[.]

General Dealer Agreement § 8(d), attached as Ex. C to Meeks Aff., ECF No. 74-5.

"The interpretation of a written contract is a question of law, unless the contract is ambiguous."  Margeson v. Artis, 776 N.W.2d 652, 659 (Iowa 2009).  Here, the Court concludes that Section 8(d) is not ambiguous and the term "warranties" in Section 8(d) must be interpreted as referring to the warranties provided by Market Scan to Plaintiffs in the Option Agreements.

The other subsections of Section 8 necessitate such a reading.  Initially, the Court notes that Section 8 deals with "warranties" relating to the "Goods" (i.e., the Trio II Systems).  Furthermore, based upon the parties' arguments relating to Section 8(c), it is clear that both Market Scan and Wells Fargo understand that the term "warranties" in Section 8(c) refers to the warranties Market Scan had provided to Plaintiffs.  Additionally, this interpretation makes sense when considering Section 8(d) along with Sections 8(b) and Section 8(c).  See General Dealer Agreement § 8(b)-(c), attached as Ex. C to Meeks Aff., ECF No. 74-5.  Examining these provisions in conjunction leads the Court to conclude that these provisions were designed to

18

require Market Scan to: (1) provide Wells Fargo with all of the authentic agreements between Market Scan and the potential lessee so that Wells Fargo would know the specifics of the deal into which it was entering, including any warranties made by Market Scan to the potential lessee; and (2) perform all of the obligations so disclosed to Wells Fargo.  Therefore, a consistent interpretation of the term "warranties" within Section 8 requires that the term "warranties" in Section 8(d) refers to the warranties provided by Market Scan to Plaintiffs.  See Restatement (Second) of Contracts § 202 (1981) ("Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other[.]").

As subsection (d) is limited to "warranties" provided by Market Scan to Plaintiffs, the Court must next determine whether Market Scan's promise in the Option Agreements to provide certain renewal terms to Plaintiffs (the "Renewal Terms Obligation") constitutes a "warranty" such that Market Scan's failure to provide these renewal terms constitutes a breach of warranty.

Market Scan does not offer any legal argument in opposition to Wells Fargo's assertion that the Renewal Terms Obligation constitutes an express warranty.  See Market Scan Opp'n Br., ECF No. 78, at 10.  Instead Market Scan argues that: (1) any warranties contained in the Option Agreements do not run to Wells Fargo; and (2) Wells Fargo "should not . . . be permitted to" disclaim knowledge of the Option Agreements and then rely upon them for a breach of warranty claim.  Neither of these arguments rebuts Wells Fargo's assertion that the Renewal Terms Obligation is a warranty.  Failing to raise an argument in opposition to a motion for summary judgment constitutes a waiver of that argument.  See, e.g., Freeman v. Middle Tp. Bd. of Educ., No. 10-6024, 2012 WL 3715925, at *3 (D.N.J. Aug. 27, 2012); Ankele v. Hambrick, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003).  Furthermore, to the extent that Market Scan makes this argument, it must be rejected because Market Scan has provided no legal authority to support

19

this position.  See Johnson v. Panetta, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("It is not the

obligation of this Court to research and construct the legal arguments available to the parties.  To

the contrary, perfunctory and undeveloped arguments, and arguments that are unsupported by

pertinent authority, are deemed waived.") (internal quotations and citations omitted); Gliniecki v.

Brunswick Corp., No. 12-280, 2013 WL 2458505, at *3 (E.D. Wis. June 5, 2013) (citing Fabriko

Acquisition Corp. v. Prokos, 536 F.3d 605, 609 (7th Cir. 2008)) ("When considering [a] motion,

it is not the Court's role to make arguments for a party.").

   Wells Fargo, in contrast, cites to provisions of the Iowa Code and caselaw to

demonstrate that legislatures and courts have expanded the term "warranty" beyond its

traditional meaning.  For example, Iowa Code § 554.2313 provides that "[a]ny affirmation of

fact or promise made by the seller to the buyer which relates to the goods and becomes part of

the basis of the bargain creates an express warranty that the goods shall conform to the

affirmation or promise."  See also Iowa Code § 554.13210 (express warranties in lease

agreements); Woodlums v. National RV, 530 F. Supp. 2d 691, 697 (M.D. Pa. 2008).

   A contractual warranty may be defined as "[a]n express or implied promise that

something in furtherance of the contract is guaranteed by one of the contracting parties[.]"

BLACK'S LAW DICTIONARY 1618 (8th ed. 2004).

   Here, the Renewal Terms Obligation was an integral component of Plaintiffs' decision to

enter into these transactions.  Accordingly, the Court concludes that the Renewal Terms

Obligation constitutes a "warranty" under Section 8(d).  As Market Scan breached this warranty,

Market Scan breached both the Option Agreements and Section 8(d) of the General Dealer

Agreement.

### d.  Damages for Breach of the Section 8(d) of the General Dealer Agreement

Section 9 of the General Dealer Agreement provides:

> If [Market Scan] breaches any representation or warranty herein with respect to a Lease entered into by Wells Fargo, which breach has a material adverse affect upon Wells Fargo's ability to collect, or the collectability of, any Lease entered into by Wells Fargo pursuant to this Agreement, [Market Scan] shall repurchase such Lease and/or Goods from Wells Fargo on demand for the unpaid balance due thereupon.

General Dealer Agreement § 9, attached as Ex. C to Meeks Aff., ECF No. 74-5.  Furthermore, any "breach of or failure to perform any of its obligations" by Market Scan constitutes an "Event of Default."  Id. § 11(a).  In the event of default, Wells Fargo is permitted to terminate the General Dealer Agreement and/or exercise its rights under the contract, the UCC, or any other law.  Id. § 12(b).  Furthermore, if a default occurs, "[Market Scan] will be liable for all costs and expenses incurred by Wells Fargo because of the occurrence of any Event of Default, including repossession cost, court costs, and reasonable attorneys' fees."  Id.

Upon careful consideration of the record, the Court finds that Market Scan's breach of Section 8(d) had a materially adverse effect on Wells Fargo's ability to collect its debt.  This litigation would not have occurred but for Market Scan's breach of its obligation to provide certain leasing terms to Plaintiffs during the renegotiation of the Lease Agreements and Option Agreements.   Furthermore, Market Scan's breach is also an Event of Default, which entitles Wells Fargo to "costs and expenses incurred by Wells Fargo because of the occurrence of any Event of Default, including repossession cost, court costs, and reasonable attorneys' fees."

Wells Fargo claims a total of $403,026.99 from Market Scan.  See Meeks Aff., ECF No. 74-2 ¶ 37.  The Court cannot, however, adopt Wells Fargo's calculation at this time.  For example, Wells Fargo offers no argument as to why Market Scan is liable for late charges or

21

whether Wells Fargo can recover both late charges and interest.  Finally, Wells Fargo has not

offered adequate substantiation to establish that its claimed attorney's fees are reasonable under

the circumstances.  As these issues have not been briefed, the Court shall limit its grant of

summary judgment as to Wells Fargo's claim for breach of contract to a determination of

liability only.   See Fed. R. Civ. P. 56(c).

    **C.  Wells Fargo's Motion for Summary Judgment Against Plaintiffs and Plaintiffs'
       Motion for Summary Judgment Against Wells Fargo**

       **1.  The Parties' Arguments**

          **a.  Wells Fargo's Arguments in Support of its Motion for Summary
             Judgment**

Wells Fargo seeks summary judgment as to its: (1) breach of contract claims; and (2)

unjust enrichment claim.  As to its breach of contract claims, Wells Fargo contends that while it

has performed all of its obligations contained in the Lease Agreements, Plaintiffs have breached

their payment obligations.  See Wells Fargo Br., ECF No 74-8, at 18.

Wells Fargo asserts that the Court should not consider any other agreements (*i.e.*, the

Option Agreements) when deciding whether Plaintiffs breached the Lease Agreements because

the Integration Clauses provide:

> You agree to all the terms and conditions shown above and on the
> reverse side of the Lease, that those terms and conditions are a
> complete and exclusive statement of our agreement and that they
> may be modified only be [sic] written agreement between you and
> us.  Terms or oral promises which are not contained in this written
> Lease may not be legally enforced.

See Lease Agreements, attached as Ex. A to Meeks Aff., ECF No. 74-3.

Additionally, Wells Fargo asserts that Plaintiffs' obligation to make the Balloon

Payments is unconditional based upon what the parties (and some courts in similar

circumstances) refer to as a "hell or high water" clause in each of the Lease Agreements (the

"Hell or High Water Clauses").  See Wells Fargo Br., ECF No. 74-8, at 18-20.  Specifically, the

Lease Agreements provide:

> YOUR DUTY TO MAKE THE LEASE PAYMENTS IS UNCONDITIONAL DESPITE EQUIPMENT FAILURE, DAMAGE, LOSS OR ANY OTHER PROBLEM.  IF THE EQUIPMENT DOES NOT WORK AS REPRESENTED BY THE VENDOR, OR IF THE VENDOR OR ANY OTHER PERSON FAILS TO PROVIDE ANY SERVICE, OR IF THE EQUIPMENT IS UNSATISFACTORY FOR ANY OTHER REASON, YOU WILL MAKE ANY SUCH CLAIM SOLELY AGAINST THE VENDOR OR OTHER PERSON AND WILL HAVE NO CLAIM AGAINST US.

Lease Agreements, attached as Ex. A to Meeks Aff., ECF No. 74-3.

Finally, Wells Fargo contends that summary judgment is appropriate as to its unjust

enrichment claim as Plaintiffs have received the benefit of using the funds due to Wells Fargo for

the past eight years.  See Wells Fargo Br., ECF No. 74-8, at 23.

### b.  Plaintiffs' Opposition to Wells Fargo's Motion and Plaintiff's Arguments in Support of their Motion for Summary Judgment

At their core, both Plaintiffs' opposition to Wells Fargo's motion and Plaintiffs'

arguments in support of their motion for summary judgment are based upon the existence of the

Option Agreements.  Plaintiffs contend the Option Agreements not only preclude a finding that

Plaintiffs breached the Lease Agreements, but also justify a declaratory judgment that Wells

Fargo can only recover the Balloon Payments directly from Market Scan.

Plaintiffs dispute that the Integration Clauses preclude the Court from considering the

Option Agreements when determining the parties' rights and obligations.  See Pls. Br., ECF No.

75-1, at 13.  Instead, Plaintiffs argue that the Option Agreements should be considered as part of

the parties' global transaction.  First, Plaintiffs argue that Wells Fargo is bound by the Option

Agreements because Market Scan approached Plaintiffs as Wells Fargo's agent and, therefore,

any promises that Market Scan made to Plaintiffs in turn bind Wells Fargo.  See id. at 1, 11.[5]

Plaintiffs also seek to have a spoliation inference drawn against Wells Fargo as to the issue of

this alleged agency relationship because Wells Fargo failed to produce certain documents that

Market Scan produced in the arbitration.  Id. at 15.

Alternatively, Plaintiffs posit that Wells Fargo is bound by the Option Agreements

because Market Scan assigned those contracts to Wells Fargo.  Id. at 13.

Even if the Lease Agreements and Option Agreements constitute separate transactions,

Plaintiffs contend that the Lease Agreements' Integration Clauses permitted the parties to modify

the Lease Agreements and the Option Agreements constitute such a valid modification.  Pl.

Opp'n Br., ECF No. 80, at 5.  As a result, Plaintiffs posit that Wells Fargo cannot rely upon the

Hell or High Water Clauses because either: (1) Market Scan's obligation to provide to Plaintiffs

with certain renewal terms was a condition precedent to Plaintiffs' obligation to make the

Balloon Payments; or (2) Markets Scan's failure to provide such renewal terms constitutes a

breach of the parties' agreement that occurred prior to Plaintiffs' obligation to make the Balloon

Payments.  See id. at 10-12.

Furthermore, even if the Hell or High Water Clauses were not modified by the Option

Agreements, Plaintiffs argue that Wells Fargo is still prohibited from relying upon these clauses

based upon theories of good faith, estoppel, or the close-connection doctrine.[6]  Id. at 12-16.

---

[5] Similarly, Plaintiffs argue in their opposition brief that the doctrines of estoppel and waiver preclude Wells Fargo from relying upon the Integration Clauses based upon Wells Fargo's grant of actual or apparent authority to Market Scan.  Pls. Opp'n Br., ECF No. 80, at 6-10.

[6] In C&J Leasing Co. v. Outlook Golf Club, LLC, the Iowa Supreme Court described the close-connection doctrine as follows:

> The close-connection doctrine developed in the context of negotiable instrument transactions to prevent holder-in-due-course status where the transferor was closely

Plaintiffs also oppose summary judgment on Wells Fargo's unjust enrichment claim. Plaintiffs argue: (1) the existence of a contract between the parties precludes summary judgment; and (2) they could not have been unjustly enriched as the Trio II System was useless without Market Scan's software and after Market Scan interrupted Plaintiffs' use of the software in April 2005, Plaintiffs were forced to enter into subsequent short-term leases with Market Scan and eventually obtain new systems and software from another company. Id. at 17.

Finally, Plaintiffs seek to limit Wells Fargo's recoverable damages. Id. at 18. First, Plaintiffs assert that Wells Fargo provided a statement of its damages on May 23, 2011, which totaled $251,510.90 in damages and $15,145.59 in attorney's fees. Id. This damage statement contained no claim for interest or late fees and did not reserve the right to seek these sums. Id. at 19. When Plaintiffs requested a statement of damages, Wells Fargo produced only a two-page spreadsheet that contained the Balloon Payments, a 10% late charge, and attorney's fees, which totaled $297,874.10. Id. At his deposition, Mr. Meeks, when asked about Wells Fargo's damages, confirmed that Wells Fargo's May 23, 2011 statement accurately reflected them. Id. Therefore, Plaintiffs aver that Wells Fargo should not be allowed to now claim over $400,000 in damages. Id. at 20. Alternatively, Plaintiffs argue that, as a matter of law, Wells Fargo cannot recover both late charges and interest. Id.

---

affiliated with the transferee. A transferee does not take an instrument in good faith when the transferee is so closely connected with the transferor that the transferee may be charged with knowledge of an infirmity in the underlying transaction.

. . .

In the context of finance leases, application of the close-connection doctrine would sever finance lessor status for a lessor who is closely connected with the equipment vendor. Therefore, the lessor would lose the ability to enforce a valid hell-or-high-water clause and would possibly be subject to the implied warranties of the vendor.

784 N.W.2d 753, 761 (Iowa 2010) (internal quotations and citations omitted).

### c. Wells Fargo's Opposition to Plaintiffs' Motion for Summary Judgment and Wells Fargo's Reply in Further Support of its Motion for Summary Judgment[7]

Wells Fargo disputes that the Option Agreements bind it in any way.  First, Wells Fargo argues that there is no evidence to support a finding of either actual or apparent authority.  Wells Fargo contends that actual authority (whether express or implied) can be conveyed only via a communication between the agent and principal.  See Wells Fargo Opp'n Br., ECF No. 79, at 10.  Here, the only communication between Wells Fargo and Market Scan is the General Dealer Agreement, which cannot be interpreted as creating an agency relationship.  Id. at 11.  Additionally, the record demonstrates that Wells Fargo did not take any actions that could have reasonably led Plaintiffs to conclude Market Scan was Wells Fargo's agent.  Id. at 12.  To support this argument, Wells Fargo relies upon the express terms of the Lease Agreements, which provide in relevant part:

> You understand that we are a separate and independent company from any vendor or manufacturer and that neither the vendor nor any other person is our agent.  You agree that no representation,

---

[7] Market Scan also submitted a brief in opposition to Plaintiffs' motion for summary judgment against Wells Fargo.  See Market Scan Opp'n Br., ECF No. 76.  The Court need not address the appropriateness of this submission as Market Scan essentially makes the same argument as Wells Fargo: the Arbitrator has already determined that Market Scan was liable only for reimbursement and Plaintiffs cannot now argue that Market Scan is responsible for making payment directly to Wells Fargo.  Id.; compare Residences at Bay Point Condominium Ass'n v. Standard Fire Ins. Co.. No. 13-2380, at * 7 (D.N.J. Dec. 4, 2013) (determining that a co-defendant can oppose another co-defendant's motion for summary judgment against a plaintiff when the plaintiff has also opposed the motion) and Guthrie v. Radiac Abrasives, Inc., No. 89-333, 1990 WL 193047, at *2 (D.N.J. Nov. 5, 1990) (considering arguments made by one defendant in opposition to another defendant's motion for summary judgment against plaintiff) with Caraballo v. Modell's Inc., No. 09-4939, 2011 WL 109899, at *3 (D.N.J. Mar. 21, 2011) (granting motion for summary judgment against plaintiff by one defendant based upon plaintiff's failure to dispute that defendant's statement of undisputed facts even though another defendant had filed an opposition to the motion); see also Travelers Prop. Cas. Co. v. Tomasella's Fire Extinguisher Co., No. 05-983, 2008 WL 108915, at *1 (D.N.J. Jan. 7, 2008) (assuming co-defendant could oppose a motion for summary judgment, but determining that no disputed issues of fact precluded summary judgment).

> guarantee, or warranty by the vendor or other person is binding on
> us, and no breach by the vendor or other person will excuse your
> obligation to us.

Id.  As to the spoliation sanction, Wells Fargo contends that the documents it did not produce are not material to Plaintiffs' claim and there is no proof that the documents were intentionally destroyed.  Id. at 19.

Wells Fargo further contends that the record is devoid of any evidence of an assignment of the Option Agreements to Wells Fargo and Iowa law requires any such assignment be reduced to writing.  Id. at 15.

Additionally, Wells Fargo believes that the very terms of the Option Agreements preclude summary judgment for Plaintiffs.  Id. at 16.  Specifically, the Option Agreements did not require Market Scan to make the Balloon Payments, but instead only required Market Scan to reimburse Plaintiffs if such payment was made.  Id.  To support this interpretation, Wells Fargo points to the Arbitrator's Final Award and Judge Hochberg's April 19, 2013 Order, which both state that Market Scan must reimburse Plaintiffs for any Balloon Payments made by Plaintiffs to Wells Fargo.  Id. at 17-18.

In its reply to Plaintiffs' opposition, Wells Fargo maintains that the Court can rely upon both the Integration Clause and the Hell or High Water Clause and that the Option Agreements do not modify, alter, or otherwise impact these provisions or Plaintiffs' obligation to make the Balloon Payments.  See Wells Fargo Reply Br., ECF No. 82.  Wells Fargo also contends that it is not prohibited from summary judgment as to its unjust enrichment claim and it is not prevented from seeking recovery for an amount larger than its May 23, 2011 demand.  Id. at 18-19.

### d.  Plaintiffs' Reply in Further Support of Their Motion for Summary Judgment

Plaintiffs' reply in further support of their summary judgment motion was filed after Market Scan had filed its opposition to Wells Fargo's motion for summary judgment against Market Scan.  As discussed above, Market Scan's submission included a declaration from Mr. West, in which Mr. West claims that Wells Fargo and Market Scan jointly developed the Option Agreements.  Unsurprisingly, Plaintiffs heavily rely upon Mr. West's declaration in further support of their motion.  For example, in support of their agency theory, Plaintiffs cite to Mr. West's declaration to demonstrate Market Scan's actual or apparent authority.  See Pls. Reply Br., ECF No. 83, at 6.

Plaintiffs argue that Wells Fargo cannot rely upon the affidavit submitted by its employee, Mr. Meeks, to contradict Mr. West's declaration because Mr. Meeks did not have any personal knowledge of the transaction at issue.  Id. at 5.  Therefore, Plaintiffs contend that the Court should accept Mr. West's claims that: (1) Market Scan and Wells Fargo jointly developed the Option Agreements; (2) Wells Fargo and Market Scan have used similar agreements in 157 transactions; and (3) copies of the Option Agreements were provided to Wells Fargo with the Lease Agreements.  Id. at 6-8.  Plaintiffs further contend that the provision in the Lease Agreements stating Market Scan is not Wells Fargo's agent is not conclusive as to the existence of an agency relationship, as Iowa courts will look beyond such provisions to determine if an agency relationship exists.  Id. at 5.

Plaintiffs also argue an assignment does not require a formal writing.  Id. at 8.  Instead, an equitable assignment is created by "any words or transactions which show an intention on one side to assign and an intention on the other to receive."  Id. at 8.  Plaintiffs contend such an intention is demonstrated by the fact that the Option Agreements were jointly created, the Option

28

Agreements and Lease Agreements were simultaneously executed, the Option Agreements were sent to Market Scan, Wells Fargo did not object to the Option Agreements, and Wells Fargo then accepted payment under the Lease Agreements.  Id. at 8-9.

Plaintiffs disagree with Market Scan's and Wells Fargo's interpretations of the Final Award and continue to assert that the arbitration award made no finding as to whether the Plaintiffs or Market Scan is required to reimburse Wells Fargo.  Id. at 9.

Plaintiffs also continue to assert that an adverse inference against Wells Fargo is appropriate under the circumstances.  Plaintiffs argue Wells Fargo has confirmed that it does not have copies of the e-mails produced by Market Scan in its files and, regardless of those documents' relevance, the nonproduction of these documents suggests other documents were destroyed or not produced.  Id. at 12.

### 2.   Analysis

#### a.   Impact of the Arbitrator's Final Award on the Parties' Claims

The Court shall first address whether the Arbitrator's Final Award, which Judge Hochberg confirmed in its entirety by Order filed on April 19, 2013, disposes of any of the arguments presently before the Court.

Wells Fargo was not a party to the arbitration and Wells Fargo's and Plaintiffs' claims against each other were not before the Arbitrator.  See Final Award, attached as Ex. A to Ayala Cert., ECF No. 73-3.  Instead, the Arbitrator addressed only claims between Market Scan and Plaintiffs relating to the Option Agreements' terms.  As the Arbitrator noted, the dispute before her "boil[ed] down" to whether Market Scan improperly included the Balloon Payments in the renewal lease rates offered to Plaintiffs.  Id. at 4.  In addressing whether Plaintiffs were entitled to reimbursement by Market Scan for Wells Fargo's attorney's fees if Wells Fargo recovered

29

such fees from Plaintiffs, the Arbitrator concluded: "Inasmuch as the terms of the Agreement
unambiguously required Market Scan to reimburse [Plaintiffs] for the Balloon Payments, not pay
them itself, it was up to [Plaintiffs] to mitigate their damages by making the Balloon Payments to
Wells Fargo when they were due." See id. at 9.  Therefore, in determining whether Plaintiffs
were entitled to a particular claimed damage (Wells Fargo's attorney's fees), the Arbitrator
interpreted the Option Agreements as requiring Market Scan to only reimburse Plaintiffs, not to
make these payments directly. [8]  The use of the word "unambiguous" is important as Iowa's
parol evidence rule precludes the consideration of any evidence to vary, add to, or subtract from
an unambiguous agreement or term.  See Montgomery Props. Corp. v. Economy Forms Corp.,
305 N.W.2d 470, 475-76 (Iowa 1981).[9]

Regarding Plaintiffs' declaratory judgment claim, Plaintiffs seek a declaration that:

(a) Plaintiffs are not required to pay to Defendant, Wells Fargo
Financial Leasing, Inc., any of the balloon payments that arose
under the prior Lease Agreements, or any penalties and fees,

---

[8] As Judge Hochberg confirmed the Arbitrator's findings and conclusions in this case, the
Court does not address whether the Arbitrator's decision, when viewed as a prior action, would
have a preclusive effect on Plaintiffs' arguments in this case.  See Veatch v. City of Waverly,
No. 13-417, 2013 WL 5962970, at *2 (Iowa Ct. App. Nov. 6, 2013) ("In order for the prior
determination to have preclusive effect, four elements must be met: (1) the issue concluded must
be identical, (2) the issue must have been raised and litigated in the prior action, (3) the issue
must have been material and relevant to the disposition in the prior action, and (4) the
determination made of the issue in the prior action must have been necessary and essential to the
resulting judgment.").  For the sake of completeness, however, the Court concludes that
Plaintiffs would still be precluded from arguing Market Scan was directly responsible for making
the Balloon Payments even if Judge Hochberg had not adopted the Arbitrator's findings and
conclusions in Her Honor's April 19, 2013 Order because the issue of repayment versus direct
payment was raised by Plaintiffs before the Arbitrator and the Arbitrator's conclusion on this
issue was material, relevant, necessary, and essential to her determination that Plaintiffs could
not recover from Market Scan any attorney's fees that Plaintiffs may pay to Wells Fargo.

[9] For example, the Van Olst Letter would not be considered under the parol evidence rule.
Nevertheless, even if the Court were to consider that document, the letter does not state Market
Scan agreed to directly pay the Balloon Payments to Wells Fargo.  See Van Olst Letter, attached
as Ex. D to Meeks Aff., ECF No. 74-6.

> unless and until Market Scan offers Plaintiffs new leases of equal or greater value to the value of the Lease Agreements . . .
>
> (b) Wells Fargo must seek collection of the balloon payments from Market Scan . . . [and]
>
> (c) Wells Fargo should be liable for costs of suit, attorney's fees, and such other relief as the Court deems just and proper.

Compl., ECF No. 1, at 14.

Similarly, at various points in their briefs, Plaintiffs appear to make two distinct arguments as to how Market Scan breached the Option Agreements: (1) Market Scan failed to offer the renewal terms contemplated by the Option Agreements; and (2) Market Scan "failed to make the balloon payments."  See Pls. Br., ECF No. 75-1 at 14.

Therefore, Plaintiffs' application for summary judgment on its declaratory judgment claim that Market Scan is directly responsible for making the Balloon Payments is denied. Similarly, the Court rejects Plaintiffs' argument, in opposition to Wells Fargo's motion for summary judgment, that responsibility for making the Balloon Payments shifted to Market Scan. To conclude otherwise would contradict the Arbitrator's ruling and, therefore, Judge Hochberg's April 19, 2013 Order.

This determination, however, does not dispose of all the parties' arguments.  Plaintiffs also seek a declaratory judgment that Plaintiffs' payment obligation does not arise "unless and until Market Scan offers Plaintiffs new leases of equal or greater value."  Additionally, Plaintiffs oppose Wells Fargo's motion for summary judgment based upon Market Scan's failure to provide it with certain renewal terms.  Therefore, the Court shall address these arguments below.

### b.  Wells Fargo's Breach of Contract Claims and Plaintiffs' Request for a Declaratory Judgment

The Lease Agreements are governed by Iowa law.  <u>See</u> Lease Agreements,

attached as Ex. A to Meeks Aff., ECF No. 74-3.  Under Iowa law:

> In a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

<u>Molo Oil</u>, 578 N.W.2d at 224 (citing <u>Iowa-Illinois Gas & Elec.</u>, 497 N.W.2d at 825).  While

Wells Fargo and Plaintiffs do not dispute that agreements exist between them, they vigorously

dispute the terms and conditions of these agreements and whether the moving party fulfilled its

obligations under the agreement.  Within these disputes lie genuine issues of material fact that

require the Court to deny both parties' motions for summary judgment.

Wells Fargo asserts that each Lease Agreement constitutes a complete statement of each

party's obligations and the Court should not consider any extrinsic evidence of

additional/differing terms (<i>i.e.</i>, the Option Agreements).  While Iowa courts apply a parol

evidence rule in contract cases, the Iowa Supreme Court has recognized that extrinsic evidence

may still be admitted under certain circumstances:

> Contract interpretation involves ascertaining the meaning of contractual words, and extrinsic evidence is admissible as an aid to interpretation when it sheds light on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain.
>
> . . .
>
> When applicable, the parol evidence rule excludes extrinsic evidence which is solely offered for the purpose of varying, adding to, or subtracting from a written agreement.  Among the exceptions to the parol evidence rule, however, is the principle that extrinsic

> evidence may be admitted to show that a writing is not an integrated
> agreement, not completely clear and unambiguous as to the subject
> in dispute, or ambiguous with respect to the subject of the lawsuit.

Kroblin v. RDR Motels, Inc., 347 N.W.2d 430, 433 (Iowa 1984) (internal citations omitted); see also Frontier Leasing Corp. v. Meikle, 760 N.W.2d 210, 2008 WL 5234370, at *3 (Iowa Ct. App. Dec. 17, 2008) (recognizing that extrinsic evidence can be admitted to demonstrate that a written contract is not a fully integrated agreement).

Although each Lease Agreement contains an Integration Clause, under Iowa law the inclusion of an integration clause in a contract is not dispositive as to whether the contract is fully integrated.  For example, in Levien Leasing Co. v. Dickey Co., Dickey Company sought to obtain certain trucks from Levien Chevrolet.  380 N.W.2d 748, 749 (Iowa Ct. App. 1985).  When it became clear that Dickey wanted to lease these trucks, Dickey was referred to Levien Leasing. Id.  Dickey entered into a lease agreement with Levien Leasing and this lease contained an integration clause.  Id. at 750.  On appeal, Levien Leasing argued that the trial court erred in admitting evidence that Levien Leasing, and the automotive leasing industry generally, routinely enter into leases with integration clauses but provide purchase options in separate documents.  Id. The Iowa Court of Appeals concluded that this parol evidence was admissible because the court was "not convinced that the parties intended the lease to be the complete expression of their agreement."  Id. at 752; see also id. at 751 ("extrinsic evidence is admissible which sheds light on the situation of the parties, antecedent negotiations, attendant circumstances, and the objects the partiers were striving to obtain").

More recently, the Supreme Court of Iowa addressed an integration clause in the context of a lease agreement involving a supplier, lessor, and lessee.  See C&J Vantage Leasing Co. v. Wolfe, 795 N.W.2d 65 (Iowa 2011).  In that case, Royal Links USA, an advertising company,

contacted Lake MacBride Golf Course ("Lake MacBride"), claiming that Lake MacBride could

obtain a free snack cart at no cost if Lake MacBride displayed certain advertising on the cart.  Id.

at 70.  Royal Links ultimately sent Lake MacBride a lease agreement (in which Lake MacBride

agreed to make lease payments for the cart to a leasing company, C&J Vantage Leasing

Company), a program agreement (in which Royal Links agreed to pay Lake MacBride for

posting advertisements on the snack cart), and several other documents.  Id. at 70-71.  The lease

agreement between C&J and Lake MacBride contained a provision stating that Royal Links was

not C&J's agent.  Id. at 71.  The lease also contained an integration clause.  Id. at 85.  Lake

MacBride sought to admit the program agreement between it and Royal Links and other

evidence to demonstrate it believed, under the totality of the transaction, it would obtain the cart

at no cost.  Id.

The Iowa Supreme Court began its analysis with the recognition that an integration

clause forbids the use of extrinsic evidence to vary, add to, or subtract from a fully integrated

agreement.  Id.  Whether an agreement is fully integrated, however, is a "question of fact" that

must be "determined from the totality of the evidence" and the presence of an integration clause

is only "one factor" to be considered in determining whether a contract is fully integrated.  Id.

The court ultimately concluded that Lake MacBride could introduce this extrinsic evidence.  Id.

Therefore, under Iowa law, the inclusion of the Integration Clauses is not dispositive

evidence that the Lease Agreements are fully integrated.  Instead, the Court must examine the

totality of the evidence to determine whether the contracts are fully integrated.  The Court finds

that disputed issues of fact exist as to whether the Lease Agreements are fully integrated.  For

example, both Wells Fargo's knowledge of and participation in developing the Loyalty Option

Program are disputed.  If Wells Fargo assisted Market Scan in developing the Loyalty Option

34

Program, knew that such option agreements would be used in this transaction (as was done in over 157 other transactions involving Wells Fargo and Market Scan), and received copies of Option Agreements at the same time it received the Lease Agreements, the trier of fact might conclude the Plaintiffs and Wells Fargo, contrary to the inclusion of an integration clause, did not intend the Leases Agreements to constitute their entire agreement.  See Kroblin v. RDR Motels, Inc., 347 N.W.2d 430, 433 (Iowa 1984); see also Wolfe, 795 N.W.2d at 85; Levien Leasing,  380 N.W.2d at 752.  Furthermore, even if the Lease Agreements were fully integrated, the Integration Clause allows for the parties to modify the Lease Agreements.  See Lease Agreements, attached as Ex. A to Meeks Aff., ECF No. 74-3; see also Smidt v. Porter, 695 N.W.2d 9, 21 (Iowa 2005) ("That said, the parol evidence rule does not bar introduction of evidence of subsequent negotiations to show modification of a written contract.").

The Option Agreements were not signed by Wells Fargo.  Plaintiffs offer two theories as to how the Option Agreements are, nevertheless, binding modifications of the Lease Agreements: (1) that Market Scan was acting as Wells Fargo's agent during negotiations and Market Scan was thus able to bind Wells Fargo; and (2) Wells Fargo accepted assignment of the Option Agreements from Market Scan.

The Court shall first address Plaintiffs' agency argument.  Under Iowa law, "whatever an agent says or does, within the scope of [its] actual or apparent authority, is the act of and binds [its] principal."  Grismore v. Consolidated Prods. Co., 5 N.W.2d 646, 651 (Iowa 1942).  "The extent of an agent's authority is usually ascertained by fair implication, from the relations of the parties, the nature of the business of the agency, the services to be rendered, and the surrounding circumstances."  Id.

Actual authority is divided into two separate concepts: express authority and implied authority. While express authority is determined by the principal's express direction, "[i]mplied authority is said to be actual authority circumstantially proved-the authority which the principal intended the agent to possess." Id. (quoting Nertney v. Nat'l Fire Ins. Co., 203 N.W. 826, 827 (Iowa 1925)). "A determination of an express or implied agency focuses on communications and contacts between the principal and the agent." AgriStor Leasing v. Farrow, 826 F.2d 732, 737 (8th Cir. 1987).

"Creation of apparent authority, on the other hand, focus on the effect the principal's conduct or communications has on a third party." Id.

> Stated inclusively, then, the rule is that if a principal acts or conducts his business either intentionally, or through negligence, or fails to disapprove of the agent's act or course of action so as to lead the public to believe that his agent possesses authority to act or contract in the name of the principal, such principal is bound by the acts of the agent within the scope of his apparent authority as to any person who, upon the faith of such holding out, believes, and has reasonable ground to believe, that the agent has such authority, and in good faith deals with him.

Id. (quoting State v. Sellers, 258 N.W.2d 292, 297 (Iowa 1977)); see Midland Restoration Co. v. Sioux City Cmty. Sch. Dist., 666 N.W.2d 621, 2003 WL 21229272, at *4 (Iowa Ct. App. May 29, 2003) ("Apparent authority is not only that which the principal holds out the agent as possessing, but also that which the principal knowingly permits."). While the Court must examine the principal's conduct or communications, they must "be interpreted in light of what [the third party] knew or should have known." Midland Restoration, 2003 WL 21229272, at *4 (finding substantial evidence of apparent authority when nothing in the alleged principal's actions could have indicated that the agent's authority was limited); see AgriStor, 826 F.2d at 738.

36

That the Lease Agreements state Market Scan is not Wells Fargo's agent is not conclusive evidence as to whether an agency relationship existed between Market Scan and Wells Fargo.  See C&J Vantage Leasing, 795 N.W.2d 65, 79 ("Frontier argues the lease agreement and the delivery and acceptance certificate expressly stated that Royal Links was not an agent of C&J.  Nevertheless, we have recognized that such express contractual statements are not conclusive as to whether an agency relationship exists.").  Instead, the existence of an agency relationship is "a question of fact to be decided by the trier of fact based upon all the facts and circumstances in evidence."  See Hall v. Crow, 34 N.W.2d 195, 200 (Iowa 1949).

The existence of an agency relationship between Wells Fargo and Market Scan is relevant to both parties' motions for summary judgment.  Accordingly, the Court must analyze the record and separately determine as to each motion whether, when viewing the record in the light most favorable to the non-moving party, there are any disputed issues of material fact that preclude a finding that an agency relationship existed.[10]

_____

[10] Plaintiffs ask the Court, when making this determination, to impute an adverse inference against Wells Fargo because Wells Fargo has spoliated evidence.  See Pl. Br., ECF No. 75-1, at 15.  Spoliation refers to the alteration, destruction, or failure to produce evidence relevant to an issue in a case.  Bull v. United Parcel Serv., Inc., 665 F.3d 68, 73 (3d Cir. 2012).  "Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party."  Id.  A litigant is "under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation."  Scott v. IBM Corp., 196 F.R.D. 233, 249 (D.N.J. 2000).  "[S]poliation of documents that are merely withheld, but not destroyed, requires evidence that the documents are actually withheld, rather than—for instance—misplaced. Withholding requires intent."  Bull, 665 F.3d at 79; MOSAID Techs., Inc . v. Samsung Elecs. Co., 348 F. Supp. 2d 332, 337 (D.N.J. 2004) (collecting cases construing "actual suppression to mean that the evidence must be intentionally or knowingly destroyed or withheld, as opposed to lost, accidentally destroyed or otherwise properly accounted for.").

Plaintiffs' only "evidence" to support a spoliation finding is the simple fact that Market Scan produced certain emails between Wells Fargo and Market Scan, but Wells Fargo did not produce those emails.  See Ex N. to the Certification of Neoma M. Ayala in Support of

It is undisputed that the Option Agreements were in Wells Fargo's file and Mr. Meeks, Wells Fargo's corporate designee, testified that he had no reason to believe Wells Fargo did not receive these documents.  Compare Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 75-2 ¶¶ 25-26 with Counterstatement of Material Facts of Wells Fargo Financial Leasing, Inc. in Opposition to Motion for Summary Judgment of Plaintiffs, ECF No. 79-1 ¶¶ 25-26.  It is also undisputed that the Lease Agreements "were presented to Plaintiffs by Market Scan on behalf of Wells Fargo" and "as a general practice, Wells Fargo provided blank leases to vendors such as Market Scan for use in transactions with lessees."  Id. at ¶¶ 27-28.

There is a factual dispute, however, as to whether Market Scan jointly developed the Loyalty Option Program with Wells Fargo.  Mr. West, the co-founder of Market Scan, represents that he has personal knowledge of Wells Fargo and Market Scan's business relationship during the relevant time period and claims that Wells Fargo jointly developed this program with Market Scan in 2000.  See West Dec., ECF No. 78-2 ¶¶ 6, 7.  Wells Fargo argues that Mr. West is "not qualified" to offer testimony as to what Wells Fargo permitted and points to the General Dealer Agreement as the exclusive recitation of the parties' relationship.  See Reply on Behalf of Wells

_____

Plaintiffs' Motion for Summary Judgment Against Wells Fargo Financial Leasing, Inc., ECF No. 75-17.  The emails at issue are from 2002.  When the Complaint in this matter was filed in 2005, these emails were already over three years old.  Plaintiffs have made no showing that Wells Fargo was in possession of these emails when Wells Fargo received Plaintiffs' discovery requests or otherwise had actual or constructive notice of this litigation.  Plaintiffs also have offered no evidence that these emails were not destroyed in the ordinary course of business and/or after litigation became reasonably foreseeable.  Certainly, Plaintiffs have not shown that they issued a timely litigation-hold request before destruction or disposal of the emails.  The fact that Market Scan produced these emails does not compel a finding of spoliation under these circumstances, as every company's electronic document retention policy and electronic storage systems are different.  In short, Plaintiffs have offered no evidence of intentional or even negligent withholding or destruction of evidence after Wells Fargo became aware of this litigation.  Therefore, the Court denies Plaintiffs' request for a spoliation inference.

Fargo Financial Leasing, Inc. to Market Scan Information Systems, Inc.'s Statement of

Additional Facts, ECF No. 82-21 ¶ 1.  The Court rejects this argument as Mr. West claims to

have personal knowledge of this relationship and has offered details about the development and

use of option agreements in over 150 transactions involving Wells Fargo and Market Scan.  It is

not inconceivable that Mr. West, as co-founder of Market Scan, would have this knowledge.

Furthermore, Wells Fargo's reliance on the General Dealer Agreement to contradict Mr. West's

assertion is misplaced.  As addressed in the Court's analysis of Section 8(c), supra, the General

Dealer Agreement did not prohibit the Loyalty Option Program.  Instead, it required only the

disclosure of this program to Wells Fargo, which, according to Mr. West, occurred.

Accordingly, there is a genuine issue of material fact on this issue.

Wells Fargo also directs the Court to Mr. Meeks's affidavit, in which he asserts that it

was Wells Fargo's general business practice not to "participate in the negotiations regarding the

terms of sale" and the company "does nothing to induce customers to lease the equipment or

seek the financing in question." See Meeks Aff., ECF No. 74-2 ¶¶ 4, 7. Specifically regarding

the Option Agreements, Mr. Meeks affirms that Wells Fargo "took no part in their presentation,

preparation or negotiation[.]" Id. ¶ 16.  Plaintiffs assert that Mr. Meeks's affidavit is a "sham"

that should be disregarded by the Court as to the relationship between Wells Fargo and Market

Scan because Mr. Meeks testified at his deposition that he did not have any communications with

either Plaintiffs or Wells Fargo concerning the lease negotiations in this case.  See Meeks Dep.

50:5-24, attached as Ex. E to the Supplemental Certification of Neoma M. Ayala, Esq. in

Opposition to Wells Fargo Financial Leasing, Inc.'s Motion for Summary Judgment ("Ayala

Supp. Cert."), ECF No. 80-7; see also Plaintiffs' Response to Defendant Wells Fargo Financial

Leasing Inc.'s Statement of Undisputed Material Facts and Counterstatement, ECF No. 80-1 ¶

39

58; Reply to Plaintiffs' Counterstatement of Undisputed Material Facts on Behalf of Wells Fargo Financial Leasing, Inc., ECF No. 82-22 ¶ 58.  In fact, Mr. Meeks first became aware of the Lease Agreements in 2005.  See Meeks Dep. 68:1-10, attached as Ex. 1 to the Declaration of Paul Marino in Support of Defendant Market Scan Information System, Inc.'s Opposition to Motion of Wells Fargo Financial Leasing, Inc. for Summary Judgment, ECF No. 78-3.

The Court concludes that Mr. Meeks's affidavit, to the extent it relates to his personal knowledge of Wells Fargo's general practices, is not a sham affidavit.  Mr. Meeks does not, however, have personal knowledge of Wells Fargo's participation in the Loyalty Option Program's development or the Option Agreements.

As stated above, the existence of an agency relationship under Iowa law is an issue of fact to be determined based upon all of the facts and circumstances surrounding the relationship. In determining actual agency, the Court must examine communications between Wells Fargo and Market Scan.  The contents of the communications between Market Scan and Wells Fargo are disputed.  While Mr. West claims Market Scan and Wells Fargo had certain communications regarding the Option Agreements before they were presented to Plaintiffs, Mr. Meeks asserts that no such communications would have taken place based upon his knowledge of Wells Fargo's business practices.  Therefore, the Court cannot make a determination of actual authority or lack of actual authority at this stage.

As to the existence of apparent agency, the Court must view the world from Plaintiffs' eyes, but still must base its decision on what authority Wells Fargo knowingly permitted Market Scan to exercise or held Market Scan out as possessing.  There are both undisputed facts that support a finding that Market Scan was Wells Fargo's agent (e.g., Wells Fargo routinely providing blank lease agreements to Market Scan and Market Scan providing the unexecuted

40

Lease Agreements to Plaintiffs in this case) and oppose this conclusion (*e.g.,* the existence of the "no agency" provision in the Lease Agreements).  Under Iowa law, however, the existence of an agency relationship is a circumstantial analysis usually reserved for a jury and disputed issues of fact preclude the Court from concluding that an agency relationship did or did not exist.  For example, the scope of Wells Fargo's knowledge of the Loyalty Opinion Program is vigorously disputed.

In the alternative, Plaintiffs argue that even if Market Scan was not Wells Fargo's agent, Wells Fargo is bound by the Option Agreements because the Option Agreements were assigned to Wells Fargo.  "An assignment is a transfer to another of the whole of any property or right therein."  Broyles v. Iowa Dep't of Social Services, 305 N.W.2d 718, 721 (Iowa 1981).  "To accomplish a valid assignment in Iowa, 'there must be a perfected transaction between the parties, intended to vest in the assignee a present right in the thing assigned.' The evidence must show the intent of the parties to effect an assignment. No particular form of assignment is necessary."  In re Rounds, 328 B.R. 132, 136 (Bankr. N.D. Iowa 2005) (quoting In re Wagner, 144 B.R. 430, 437 (Bankr. N.D. Iowa 1991), aff'd 173 B.R. 916 (N.D. Iowa 1994)).

While the parties devote much of their arguments to the issue of whether assignment of the Option Agreements required a formal writing of assignment, the Court need not address the issue.  Even in the context of an equitable assignment, Plaintiffs concede that a finding of an equitable assignment requires a demonstration of "words or transactions which show an intention on one side to assign and an intention on the other to receive, if there is valuable consideration."  Pls. Reply Br., ECF No. 83, at 8 (quoting Rounds v. First Security State Bank, 328 B.R. 132, 136 (Bankr. N.D. Iowa 2005)).  Here, construing the record in the light most favorable to Wells Fargo as non-movant, there has been no assignment, whether based upon a formal writing or

principles of equity.  The fact that Wells Fargo received copies of the Option Agreements does not, by itself or in conjunction with the other undisputed facts in this case, demonstrate either Market Scan's intention to assign or Wells Fargo's intention to receive.  Additionally, Plaintiffs have offered no evidence of what "benefit" or consideration was exchanged between Wells Fargo and Market Scan for this assignment.  Under Plaintiffs' reasoning, any knowing third-party beneficiary to a contract would be considered an assignee of that contract.

The parties' actions after the alleged assignment also do not support a finding that the contracts were assigned.  After the alleged assignment, it was Market Scan, not Wells Fargo, that entered into renewal negotiations.  Plaintiffs' assertion that these agreements were assigned is belied by the fact that Plaintiffs sought to recover from Market Scan for breaching the Option Agreements.

The Court must next determine if the Option Agreements modified the Lease Agreements, what impact this modification has on Plaintiffs' payment obligation.  Wells Fargo asserts that the Hell or High Water Clause in each Lease Agreement created an unconditional obligation for Plaintiffs to make all payments, including the Balloon Payments.  Under Iowa law, "[a] hell-or-high-water clause is a contractual provision that requires a lessee to absolutely and unconditionally fulfill its obligations under the lease in all events (i.e., come hell or high water)." Wolfe, 795 N.W.2d at 76-77.  Additionally, in the context of finance leases, Iowa Code § 554.13407 provides:

1. In the case of a finance lease that is not a consumer lease the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods.

2. A promise that has become irrevocable and independent under subsection 1:

42

        a.  is effective and enforceable between the parties, and by or against third parties including assignees of the parties, and

        b.  is not subject to cancellation, termination, modification, repudiation, excuse, or substitution without the consent of the party to whom the promise runs.

Hell or high water provisions are routinely enforced by Iowa courts, but these courts recognize that such clauses do not preclude a party from raising challenges to the contract's formation. Wolfe, 795 N.W.2d at 78-79; Iowa Code § 554.13407(2)(b).

Here, the Hell or High Water Clauses read:

> YOUR DUTY TO MAKE THE LEASE PAYMENTS IS UNCONDITIONAL DESPITE EQUIPMENT FAILURE, DAMAGE, LOSS OR ANY OTHER PROBLEM.  IF THE EQUIPMENT DOES NOT WORK AS REPRESENTED BY THE VENDOR, OR IF THE VENDOR OR ANY OTHER PERSON FAILS TO PROVIDE ANY SERVICE, OR IF THE EQUIPMENT IS UNSATISFACTORY FOR ANY OTHER REASON, YOU WILL MAKE ANY SUCH CLAIM SOLELY AGAINST THE VENDOR OR OTHER PERSON AND WILL HAVE NO CLAIM AGAINST US.

See Lease Agreements, attached as Ex. A to Meeks Aff., ECF No. 74-3.  The Lease Agreements' Integration Clauses, however, provide that the Lease Agreements can be modified.  Id. Therefore, based upon Iowa law and the Lease Agreements' terms, Plaintiffs are not precluded from arguing that the clause has been modified.[11]

As addressed in Section III.C.2.a, above, to the extent that Plaintiffs assert that the Option Agreements shifted responsibility to Market Scan to make the Balloon Payments, this argument fails as the Arbitrator already determined that the Option Agreements "unambiguously required

---

[11] Based upon the Hell or High Water Clause's wording, the Court need not determine the application of Iowa Code § 554.13407 to the Lease Agreements.  See Wolfe, 795 N.W.2d at 78 (holding that express hell or high water clauses are enforceable in both finance leases and sales with security interests).

Market Scan to reimburse [Plaintiffs] for the Balloon Payments not pay them itself[.]"  See Final

Award, attached as Ex. A to Ayala Cert., ECF No. 73-3, at 9.

Plaintiffs, however, also argue that Market Scan's breach excused Plaintiffs from making

the Balloon Payments.  Plaintiffs are correct that "[i]t is a basic principle of contract law that

once one party to a contract breaches the agreement, the other party is no longer obligated to

continue performing his or her own contractual obligations."  Kelly v. Iowa Mut. Ins. Co., 620

N.W.2d 637, 641 (Iowa 2000).  Certain courts have also recognized that a payment obligation

may be excused even if the contract contains a hell or high water clause when a condition

precedent does not occur.  See IFC Credit Corp. v. Burton Indus., 536 F.3d 610, 615 (7th Cir.

2008); Gaia Leasing LLC v. Wendelta, Inc., No. 09-1067, 2010 WL 5421324, at *4 (D. Minn.

2010) (same); see also Wolfe, 795 N.W.2d at 78 (noting that the parties' agreement must be

enforced based upon its terms).  Additionally, Iowa courts recognize that an agent's actions may

invalidate a hell or high water clause.  See C&J Vantage Leasing Co. v. Outlook Farm Golf

Club, LLC, 784 N.W.2d 753, 758-59 (Iowa 2010).

Disputed issues of fact exist as to whether the Option Agreements somehow excuse

Plaintiffs' obligation to make the Balloon Payments.  Neither party has advanced sufficient

undisputed facts for the Court to adduce the parties' intent regarding the interplay between

Plaintiffs' payment obligation in the Lease Agreements and Market Scan's obligation to provide

certain renewal terms in the Option Agreements.  For example, it is unclear whether Plaintiffs'

payment obligation arose after Market Scan provided Plaintiffs with appropriate renewal lease

terms.  The Option Agreements are ambiguous.  These contracts state that Plaintiffs will be

provided with this choice "upon expiration" of the Lease Agreements (suggesting that Plaintiffs

would have to make the Balloon Payments first).  However, the second option memorialized in

44

the Option Agreements is for Plaintiffs to return the Trio II Systems and <u>then</u> "make" the Balloon Payment (suggesting that Plaintiffs would make their decision before the Balloon Payments became due). The Van Olst Letter further confuses this issue as that correspondence provides the Balloon Payments will be "paid" by Market Scan upon "renewal." <u>See</u> Van Olst Letter, attached as Ex. D to Meeks Aff., ECF No. 74-6.

In summary, the Court concludes that Wells Fargo's motion for summary judgment for its breach of contract claims must be denied as disputed issues of material fact exist as to the terms of the parties' agreement and whether Wells Fargo (and its alleged agent Market Scan) fulfilled its obligations under the allegedly modified agreements.[12]  Similarly, Plaintiffs' motion for summary judgment must also be denied as Plaintiffs have failed to demonstrate that the Lease Agreements were actually modified and that the alleged modification excused their obligation to make the Balloon Payments.[13]

### c.   Wells Fargo's Unjust Enrichment Claim

Under Iowa law:

> One asserting a claim of unjust enrichment must establish three propositions: (1) defendant was enriched by the receipt of a benefit, (2) the enrichment was at the expense of the plaintiff, and (3) it is unjust to allow the defendant to retain the benefit under the circumstances.  However, a plaintiff cannot recover on an implied

---

[12] Because the Court has already determined that genuine issues of fact preclude a determination as to whether the Option Agreements modified Plaintiffs' unconditional payment obligation and the Iowa Supreme Court has not issued a definitive determination as to the application of the close-connection doctrine in Iowa, the Court declines, at this time, to address the application of the close-connection doctrine in this case.  <u>See</u> <u>C&J Leasing</u>, 784 N.W.2d at 761.

[13] To the extent the parties raise equitable arguments as to Wells Fargo's breach of contract claim or Plaintiffs' declaratory judgment claim, summary judgment must still be denied as the factual circumstances that would form the basis for equitable relief are disputed.  <u>See</u> <u>Margeson v. Artis</u>, 776 N.W.2d 652, 659 (Iowa 2009) (recognizing the doctrine of equitable estoppel in contract cases).

45

> contract or unjust enrichment when the alleged damages arise from
> a matter covered by an express written contract. Thus, generally the
> existence of a contract precludes the application of the doctrine of
> unjust enrichment, but there may be an implied contract on a point
> not covered by an express one.

Brinkmann v. St. Paul Fire & Marine Ins. Co., 723 N.W.2d 449, 2006 WL 1750491, at *3 (Iowa

Ct. App. June 28, 2006) (internal citations omitted). Here, Wells Fargo is seeking recovery of

funds due under the Lease Agreements' express terms. Putting aside whether Wells Fargo

waived its recovery of late fees and/or interest (which the Court need not address at this time),

the Lease Agreements clearly contemplated and addressed Plaintiffs' nonpayment of amounts

due under these contracts. Therefore, as Wells Fargo's damages arise from a written contract,

Wells Fargo's motion for summary judgment as to its claim for unjust enrichment is denied.

### d.  Conclusion

As both Plaintiffs' and Wells Fargo's motions for summary judgment are denied as to

liability, the Court declines to address, at this time, the parties' arguments regarding the

recoverable damages for these claims.

## IV.   PLAINTIFFS' MOTION TO ENFORCE THE COURT'S APRIL 19, 2013 ORDER

As addressed above, the claims between Market Scan and Plaintiffs were arbitrated

before Deborah Rothman of the American Arbitration Association. The Arbitrator found in

favor of Plaintiffs and ordered that Market Scan was required to reimburse Plaintiffs for any

Balloon Payments that Plaintiffs make to Wells Fargo. See Final Award, attached as Ex. A to

Ayala Cert., ECF No. 73-3, at 11. Because the contract between Market Scan and Plaintiffs

contained a provision requiring the losing party to reimburse the prevailing party the costs of the

46

arbitration and the prevailing party's attorney's fees/costs, the Arbitrator also ordered that, within

10 days, Market Scan must pay Plaintiffs $205,417.61 in fees and $6,000.99 in costs.  See id.[14]

On April 19, 2013, Judge Hochberg entered an Order confirming the arbitration award

"in its entirety for Plaintiffs and against Market Scan."  See Order, ECF No. 56.  Specifically,

Judge Hochberg stated:

> Market Scan is ordered to indemnify Plaintiffs against any judgment
> of a Balloon Payment obtained by Wells Fargo against Plaintiffs in
> the next stage of this litigation.  Market Scan is also ordered to obey
> the other provisions in the award[.]

Id.  As many claims remained between the parties, Judge Hochberg denied Plaintiffs' request for

entry of final judgment pursuant to Federal Rule of Civil Procedure 54.  Id.

Plaintiffs now move for the Court to issue an order "enforcing" the April 19, 2013 Order,

in that Market Scan has not remitted the $211,418.60 in fees and costs that was to be paid within

10 days of the Arbitrator's ruling.

### A.   The Parties' Arguments

#### 1.   Plaintiffs' Moving Brief

Plaintiffs argue that Market Scan's failure to make this payment constitutes a

"contumacious[] disregard" for the express terms of the April 19, 2013 Order, in that the Order

required Market Scan to comply with the "other provisions" of the award, which includes

payment of the fees/costs within 10 days.  See Pls. Br., ECF No. 73-1, at 3.  Plaintiffs argue that

the Court should exercise its inherent and/or statutory authority to hold Market Scan in contempt

---

[14] The Arbitrator reviewed Plaintiffs' claimed fees and costs and found these amounts appropriate under the circumstances, in part based upon Market Scan's "adversarial" tactics during prehearing proceedings and numerous discovery disputes.  Id.

for failing to make this payment.  Id. at 3.  Plaintiffs also request the Court exercise its discretion

to award Plaintiffs the fees and costs of bringing this motion.  Id. at 4.

### 2.  Market Scan's Opposition Brief

Market Scan argues in opposition that the April 19, 2013 Order did not require Market

Scan to *immediately* make this payment (*i.e.,* before a final judgment was issued).  See Market

Scan Opp'n Br., ECF No. 77.  While Judge Hochberg did order Market Scan to comply with the

award, Judge Hochberg denied Plaintiffs' application for entry of a final judgment.  Id.  Because

the fees/costs award constitutes a money judgment, a contempt order is not the appropriate

method for enforcement.  Id. at 4.  Instead, a party seeking to enforce a money judgment,

pursuant to Federal Rule of Civil Procedure 69, must generally seek a writ of execution unless

"well established principles warrant equitable relief."  Id.  (quoting Ardex Labs., Inc. v.

Cooperider, 319 F. Supp. 2d 507, 509 (E.D. Pa. 2004)).   As no such equitable considerations

exist in this case, Plaintiffs must wait until entry of final judgment to seek a writ of execution for

this sum.  Id. at 6-7.

### 3.  Plaintiffs' Reply Brief

Plaintiffs essentially turn Market Scan's argument on its head:  While Market Scan

argues that Plaintiffs' motion must be denied as the April 19, 2013 Order is an interlocutory

order and a writ of execution requires entry of a final judgment, Plaintiffs argue that their motion

for contempt is the appropriate vehicle for relief because a writ of execution can only be issued

on a final judgment.  See Pls. Reply Br., ECF No. 84, at 3-4.  Plaintiffs assert that Rule 69 does

not prohibit Plaintiffs' requested relief as Wells Fargo's position leaves them without any

remedy to recover after eight years of litigation.  Finally, Plaintiffs contend that, at a minimum,

Market Scan should post a bond to secure its obligation.  See id. at 7.

### B. Analysis

"A money judgment is enforced by a writ of execution, unless the court directs otherwise." Fed. R. Civ. P. 69(a). "Although the language of Rule 69(a) contemplates other means to enforce money judgments, 'such other means are confined only to cases in which established principles warrant equitable relief, such as when execution would be an inadequate remedy.'" Ardex Labs., Inc. v. Cooperider, 319 F. Supp. 2d 507, 509 (E.D. Pa. 2004) (quoting Moore's Federal Practice § 69.02 (3d ed. 2003)). In the context of attorney fee awards, "[o]rdinarily, [a] plaintiff must seek enforcement of an order that awards attorney fees through a writ of execution." Id.

The parties do not dispute that the April 19, 2013 Order is an interlocutory order. See Market Scan Opp'n Br., ECF No. 77, at 6, Pls. Reply Br., ECF No. 84, at 4. As the award of attorney fees and costs is a money judgment, "the appropriate remedy is a writ of execution, not a finding of contempt." Combs v. Ruan's Coal Co., 785 F.2d 970, 980 (11th Cir. 1986); see also Aetna Cas. & Sur. Co. v. Markarian, 114 F.3d 346, 349 (1st Cir. 1997) (finding the issuance of a writ *ne exeat* for a party's failure to pay a money judgment was reversible error as such a writ should be used in circumstances where a party can be held in contempt and a writ of execution, not contempt, was the appropriate remedy for the non-payment of a monetary judgment). While Plaintiffs cite to cases in which a court exercised its contempt powers to enforce interlocutory orders, the orders at issue were not traditional money judgments such that a writ of execution would have been the appropriate vehicle for enforcement. See MCA, Inc. v. Wilson, 425 F. Supp. 457, 459 (S.D.N.Y. 1977) (finding defendant in contempt for failing to turn over property); In re Walsh, 123 B.R. 925, 929 (noting that an interlocutory order in state court should be enforced through contempt sanctions when that interlocutory order required the return of

49

funds to a probate estate); Constr. Laborers Trust Fund v. Domenech, No. 08-2190, 2008 WL 4852945, at *2 (C.D. Cal. Nov. 6, 2008) (finding party in contempt of an interlocutory order requiring that the party submit to an accounting).

Here, a writ of execution is not an inadequate remedy such that Plaintiffs should be allowed to use contempt sanctions to compel payment.  See N.J. Bldg. Laborers' Statewide Benefit Funds v. Gen. Civ. Corp., No. 08-6056, 2009 U.S. Dist. LEXIS 78088, at *5-6 (D.N.J. Sept. 1, 2009) ("Alternative methods of enforcement are not favored unless a writ would be an inadequate remedy, and contempt sanctions should be imposed as an enforcement method only in exceptional  circumstances.").  While it is true that Plaintiffs must wait until the entry of a final judgment to obtain a writ of execution to compel collection of these funds, see Gerardi v. Pelullo, 16 F.3d 1363, 1371 n.3 (3d Cir. 1994) (noting that a judgment that is not final or certified pursuant to Rule 54(b) is not subject to execution), such a delay occurs in any case in which a court issues a ruling as to some, but not all, claims.  This common occurrence cannot, therefore, alone constitute sufficient equitable considerations to allow collection through contempt proceedings.

The Court, in reaching this decision, does not in any way alter or ignore any aspect of Judge Hochberg's April 19, 2013 Order.  While Judge Hochberg ordered Market Scan to comply with the Final Award's terms, Her Honor did not specifically order payment of fees and costs within a certain period of time.  Instead, Judge Hochberg did specifically deny Plaintiffs' motion for certification pursuant to Federal Rule of Civil Procedure 54(b).  By denying this request, Judge Hochberg precluded Plaintiffs from obtaining a writ of execution as to their recovery of attorney's fees and costs prior to entry of a final judgment.  Judge Hochberg made no finding that circumstances warranted exempting Plaintiffs from Rule 69(a)'s general directive that

50

Plaintiffs should wait for entry of a final judgment such that a writ of execution could be used to recover these attorney's fees and costs. And as discussed above, the Undersigned finds that, based upon the record before it, a writ of execution is an adequate remedy and no considerations warrant equitable relief. Accordingly, the Court denies Plaintiffs' motion.[15]

## V.   CONCLUSION

For the reasons set forth above: (1) Wells Fargo's motion for summary judgment against Market Scan is denied-in-part and granted-in-part; (2) Plaintiffs' motion for summary judgment against Wells Fargo is denied; (3) Wells Fargo's motion for summary judgment against Plaintiffs is denied; and (4) Plaintiffs' motion to enforce the Court's April 19, 2013 Order is denied.

Dated: April 30, 2014          /s Michael A. Hammer_____
                               **United States Magistrate Judge**

---

[15] Furthermore, to the extent contempt sanctions would be a permissive remedy in these circumstances, the Court would exercise its discretion and decline to impose sanctions against Market Scan. As Judge Hochberg denied Rule 54(b) certification, Market Scan has not yet been allowed to consider whether it will file a timely appeal or make payment. Ordering Market Scan to pay this amount prior to the entry of final judgment would deprive Market Scan of its opportunity make this choice.

Additionally, the Court shall deny Plaintiffs' request that Market Scan post a bond for the fees/cost award at issue. While Plaintiffs have cited to a Ninth Circuit case in which that court concluded that "Rule 69(a) does not preclude a court from requiring a party to post bond as security to ensure the payment of future damages[,]" Whittaker Corp. v. Execuair Corp., 953 F.2d 510, 516 (9th Cir. 1992), Plaintiffs fail to explain why posting of such a bond is warranted in this case.